**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cr-20051-JPM** |
| | ) | |
| **COURTNEY TRENELL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Courtney Trenell's Motion to Suppress, filed August 15, 2022.  (ECF No. 21.)  District Judge Jon P. McCalla referred the motion to the undersigned for report and recommendation.  (ECF No. 24.)  The United States responded in opposition on September 7, 2022, submitting three exhibits: the bodycam video of Officer Bryan Alvarado (US Exhibit 1), a list of warrant information (US Exhibit 2), and the bodycam video of Detective Jessica Laine (US Exhibit 3).  (ECF No. 32.)

The Court held a hearing on September 27, 2022, which continued to October 13, 2022. (ECF Nos. 33, 34.)  At the hearing, the United States called two witnesses, Detective Stephen Westrich and Officer Michael Bartlett.  Trenell called two witnesses, Officer Alvarado and Detective Laine, and introduced into evidence seven exhibits: an image from Google Maps (Defense Exhibit 1), an aerial photograph from Google Maps (Defense Exhibit 2), a photograph (Defense Exhibit 3), a flash drive containing video files (Defense Exhibit 4),[1] an affidavit of

---

[1] Counsel for defense indicated that the flash drive contains the same bodycam video files that the United States had previously submitted as US Exhibits 1 and 2.

complaint dated July 22, 2021 (Defense Exhibit 5), a Memphis Police Department incident

report dated July 21, 2022 (Defense Exhibit 6), and another photograph (Defense Exhibit 7).

Trenell filed a post-hearing memorandum on October 21, 2022 (ECF No. 35), as did the

United States on October 27, 2022 (ECF No. 36).

After careful consideration of the statements of counsel, the testimony of the witnesses,

the evidentiary exhibits, and the entire record in this case, the Court recommends that the motion

be denied.

## PROPOSED FINDINGS OF FACT

The following proposed facts are taken from the sworn testimony presented at the

suppression hearing.  Where factual conflicts were presented, these facts represent the

undersigned's resolution of those conflicts after considering the credibility of the witness and

supporting evidence.

Detective Westrich has worked for the Memphis Police Department ("MPD") for ten

years, working in regular patrol, as a task force officer, and in violent crimes.  For the past six

years, he has been assigned on and off to do surveillance as a plainclothes officer, investigating

carjackings, robberies, and interstate shootings, and he has been in his current unit since April of

2021.  The purpose of the surveillance he conducts is to observe suspects undertaking criminal

activity and then relay that information to marked units, who make the arrest.  He has

participated in dozens of such arrests.

On July 21, 2021, Detective Westrich was working with a city-wide task force composed

of officers from various precincts, and he was asked to surveil a carwash at 2256 Airways

Boulevard in Memphis.  MPD considered the location a problem area, with high instances of

gang activity, drugs, and assaults.  Detective Westrich parked his car across the street at a liquor

store about 200 feet away, directly across from the carwash. From his car, Detective Westrich surveilled the carwash using a pair of binoculars he had bought for his son, which he described as normal-sized, adjustable, and cheap. Defense Exhibits 1 and 2 are maps that show the relative locations of the carwash and Detective Westrich's location, and Defense Exhibit 3 is a photograph of the vicinity of Detective Westrich's location.

The carwash was full of people and cars that day. After ten to fifteen minutes of surveillance, Detective Westrich saw an individual engage in a hand-to-hand transaction on the north side of the carwash. Detective Westrich testified that a hand-to-hand transaction indicates the sale of narcotics, and he has seen such transactions before in his undercover capacity. He saw the individual reach into his pocket, shake hands with another person, and then walk away twenty seconds later. He did not actually see any drugs or money exchanged. The individual then walked to a vehicle on the south side of the carwash, and Detective Westrich saw a gun in the individual's waistband, observing the shape of what looked like a handle and slide. Detective Westrich did not recall where the other person went. The individual got into the vehicle and did not get out again. Detective Westrich did not recall seeing the individual talk to anyone else while he was surveilling him.

Detective Westrich then alerted the other task force officers, via his city-issued, car-to-car radio,[2] and gave them a description of the individual and his vehicle (though he could not recall that description at the hearing). Those units were nearby and arrived at the carwash in two minutes or less. Detective Westrich watched the individual during those two minutes and did not lose sight of him.

---

[2] Detective Westrich testified that the radio is technically called Channel B, and anyone on that channel can hear what is broadcasted.

Approximately twenty officers made the scene. Defense Exhibit 7, a still image from the bodycam video, shows the scene at the carwash that day, with at least seven patrol cars visible in the image. Among the officers were Officer Bartlett, Officer Alvarado, and Detective Laine. Officer Bartlett has worked for MPD for twelve years, with eleven of those years at the Airways Station. He is currently assigned to the Airways task force. Officer Alvarado has worked for MPD for three years, assigned to the Ridgeway task force, a small unit that does warrant pickups and patrols high crime areas. Detective Laine has worked for MPD for seven years and, at the time, was assigned to the Airways task force.

During the July 21, 2022 operation, Officer Bartlett heard Detective Westrich's report over the radio of an individual armed with a handgun who had participated in a hand-to-hand transaction. He heard Detective Westrich describe the individual and his vehicle. Detective Laine similarly testified that she heard information about an armed individual engaging in a hand-to-hand drug transaction. Officer Alvarado testified that Detective Westrich put out on the radio that he saw a Black male in a white T-shirt with a handgun in his waistband, loitering in the lot and not washing a car, get into a small, silver SUV. Upon learning this information, the officers drove to the carwash.

Officer Alvarado's bodycam video, US Exhibit 1, shows that he pulled up to the carwash at 5:06 p.m. and immediately got out of his patrol car and walked up to a silver Nissan Murano SUV parked in front of one of the carwash bays, as Officer Bartlett approached from the rear. Officer Bartlett testified that the silver SUV was the vehicle identified by Detective Westrich. In the video, Officer Alvarado walks to the driver's door and, as the driver opens the door, asks for identification. The individual sitting in the driver's seat, Trenell, wearing a white T-shirt, gets out of the car, retrieves his wallet from his pocket, and hands his identification card to Officer

Alvarado, who walks back to his patrol car to retrieve his PDA while Officer Bartlett stands with

Trenell and a woman (identified as Trenell's girlfriend) next to the SUV.  Officer Alvarado

inputs information from the card into his PDA and walks back to the SUV, where he tells Trenell

to put his hands on the vehicle.  Trenell turns around and shuts the driver's door, and at 5:07:30,

a brief honk is heard, indicating the car was locked at that time.

Officer Alvarado places Trenell in handcuffs, and at 5:07:46, he tells Officer Bartlett,

"signal W," which Officer Alvarado testified was a way to let other officers know Trenell had

active warrants.  Officer Bartlett asks, "what for?" and Officer Alvarado responds, "a bunch of

[unintelligible]."  At 5:08:02, Officer Alvarado hands his PDA to Officer Bartlett, who reads it,

while Officer Alvarado tells Trenell and his girlfriend that Trenell has a warrant.  Officers

Bartlett and Alvarado both testified that the PDA showed that Officer Alvarado had run Trenell

through Ties, a law enforcement database, which indicated that Trenell had outstanding warrants

for unlawful possession of a handgun by a convicted felon and aggravated assault.  Trenell's

girlfriend then reaches multiple times into Trenell's pants pockets to retrieve various items from

them.

At 5:08:18, other officers approach, including Detective Laine,[3] and Officer Bartlett tells

them, "this is the car, what are we doing?"  Detective Laine's bodycam video, US Exhibit 3,

shows her walk to the passenger door of the SUV and try to open it, but it is locked, and she then

looks in the windows.  At 5:08:30, Officer Bartlett tells her, "Alright, this is the car he saw him

get in with the gun.  Literally called it out."  Officer Bartlett testified that he was telling

---

[3] Detective Laine's testimony and bodycam video reflect that she did not approach the silver
SUV upon arriving at the carwash at 5:06.  Instead, she encounters another individual and pats
him down, and she then walks around to several cars, looking in the windows and trying some of
the handles to see if they are unlocked, before she walks over to meet Officer Bartlett at the
silver SUV approximately two minutes later.

Detective Laine that this was the vehicle Detective Westrich saw Trenell get into with the gun. Officer Bartlett then tells Trenell's girlfriend, "unlock the car, ma'am," and begins reaching for the keys in her hand. Detective Laine then begins to grab for the keys, saying "gimme these keys," and as the girlfriend protests, Detective Laine gets hold of a large key fob and, at 5:08:39, presses a button on it several times, unlocking the SUV.

At 5:08:50, Detective Laine then opens the driver's door of the SUV and begins to search the vehicle, while Officer Bartlett follows the girlfriend walking away from the car. At 5:09:05, the glove compartment appears closed as another officer opens the passenger door. Detective Laine then searches various parts of the driver's side of the car, and when the glove compartment is again in view on her bodycam video, it appears that it is now open, with the butt of a firearm visible inside. At 5:09:31, she says, "I don't see one," and then two seconds later says, "oh, here it is," and retrieves the firearm from what she testified was an unlocked "slot on the side of the radio."[4] Detective Laine testified that she knew Trenell had been arrested before she began the search, but she did not remember if she knew why. She testified that she was searching the SUV looking for a firearm and drugs based on Detective Westrich's report of an armed individual conducting a hand-to-hand transaction.[5]

Meanwhile, Officer Alvarado's bodycam video shows that he walks Trenell away, begins patting him down at 5:08:35, completes the pat down at 5:08:54 (no drugs or firearms were found on Trenell), and places him in the patrol car. At 5:09:40, Officer Alvarado returns to the SUV, where Officer Bartlett says, "this is the car they called out, I don't know why nobody else

---

[4] Detective Laine testified that she "wouldn't call that the glove compartment area, it was an open unlocked slot." The location of the firearm is discussed further in note 8, *infra*.
[5] Other officers also recovered THC cartridges from the SUV, but Trenell was not charged in relation to those items.

came over here."  Officer Alvarado then returns to his patrol car and begins writing up the report, and, at 5:11:41, Detective Laine asks, "he is a convicted felon, right?"

Officer Alvarado wrote up the report of the incident (Defense Exhibit 6), and the affidavit of complaint (Defense Exhibit 5) was based on information he provided.  Though the affidavit of complaint and incident report indicate that Officer Alvarado saw Trenell loitering, he testified that was a mistake, as he was only on the scene for ten to fifteen seconds before he approached Trenell, who was sitting in the SUV.  Officer Alvarado testified that he included in the report that Detective Laine saw the firearm in plain view because she told him she did.  The United States conceded at the hearing that the report is poorly written and does not reflect Detective Westrich's role in the operation.

On March 31, 2022, a federal grand jury returned an indictment charging Trenell with knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

## PROPOSED CONCLUSIONS OF LAW

Trenell seeks suppression of the fruits of an illegal stop and search unsupported by probable cause.  His initial motion to suppress argued that the stop was illegal and unreasonable because the incident report indicates that Officer Alvarado observed Trenell loitering, whereas the bodycam video shows that Officer Alvarado approached Trenell immediately upon pulling into the carwash, without any knowledge of criminal activity.  Through the United States' response (ECF No. 32), however, Trenell learned of the United States' position that Detective Westrich had seen Trenell engage in a drug transaction while armed and had communicated that information to the other officers.  Trenell thus requested additional briefing and now questions

the accuracy of the evidence regarding Detective Westrich's report and argues that Detective

Laine's search of the vehicle lacked probable cause.

"The government has the burden of proving the legality of a warrantless search." *United*

*States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (citing *United States v. Haynes*, 301 F.3d

669, 677 (6th Cir. 2002)).

## I.    The Legality of the Stop

Based on the United States' version of the facts, the stop of Trenell was valid, as it was

supported by reasonable suspicion.  "The Fourth Amendment's prohibition on 'unreasonable . . .

seizures' allows temporary investigative detentions, known as *Terry* stops, so long as there is 'a

reasonable suspicion supported by articulable facts that criminal activity may be afoot.'"  *United*

*States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting U.S. Const. amend. IV; *United*

*States v. Sokolow*, 490 U.S. 1, 7 (1989)).  The "'degree of suspicion' required . . . is quite low: 'a

moderate chance of finding evidence of wrongdoing.'"  *Id.* (quoting *Sokolow*, 490 U.S. at 10;

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–71 (2009)).  That "modest bar"

requires only "a suspicion that is 'particularized' (tailored to a specific person) and 'objective'

(based on more than a hunch) under the totality of the circumstances known to the officer."

*United States v. Faught*, No. 21-6123, 2022 WL 2813240, at *3 (6th Cir. July 19, 2022) (citing

*Sokolow*, 490 U.S. at 7; *Kansas v. Glover*, 589 U.S. –, 140 S. Ct. 1183, 1187 (2020)).  "That

includes the officer's own observations as well as information the officer receives from police

reports, dispatch, and fellow officers."  *McCallister*, 39 F.4th at 374 (citing *United States v.*

*Campbell*, 549 F.3d 364, 371 (6th Cir. 2008)).

As noted by the United States, the Sixth Circuit recently considered a factually similar

case in *Faught*.  There, an officer monitoring surveillance cameras saw what he thought was a

drug deal—two people "met for a brief period in a courtyard and walked to the side of a building away from normal pedestrian traffic[, where t]hey engaged in 'some sort of hand transaction,'" after which they quickly parted.  2022 WL 2813240, at *1.  The officer did not see anything change possession, however, and could not rule out a fist bump.  *Id.*  The officer then radioed other team members, who enlisted a patrolman in the area to stop one of the suspects.  The court found the patrolman had reasonable suspicion for the stop based on the totality of the circumstances.  "We have repeatedly held that an officer's observation of a hand-to-hand transaction that looks like a drug deal can help establish the reasonable suspicion required for a stop to investigate the parties."  *Id.* at *4 (citing *United States v. Paulette*, 457 F.3d 601, 605 (6th Cir. 2006)).  The hand-to-hand transaction, in addition to the other circumstances—the surveilling officer was experienced, having been involved in more than 500 controlled buys, the area was described as "high crime,"[6] the pair moved their interaction to a secluded spot, and they separated quickly—established reasonable suspicion.  *Id.*

The totality of the circumstances similarly establishes reasonable suspicion in this case. Detective Westrich had ten years of experience as an officer and had participated in dozens of surveillance operations, including those involving hand-to-hand drug transactions.  Through his binoculars, directly across the street from the carwash, he saw an individual engage in an interaction in which he reached into his pocket, shook hands with another person, then quickly walked away.  He also saw the shape of a firearm in the waistband of that individual.  The carwash was considered to be a problematic location, known for hosting drug sales and other crimes.  He communicated to the team his suspicion of a hand-to-hand drug transaction by an

---

[6] *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–148 (1972)) ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis.").

armed individual, who he described as wearing a white T-shirt and sitting in a small, silver SUV. Officers Bartlett and Alvarado heard that information and, upon arriving at the carwash, immediately saw Trenell in a white T-shirt sitting in a silver Nissan Murano.  Their suspicion that Trenell was engaged in criminal conduct was particularized, objective, and reasonable.

Trenell does not contest this legal conclusion but instead argues that the officers' testimony was incomplete and contradictory, questioning whether that evidence "lend[s] credence to the idea that there was not a radio transmission regarding a hand-to-hand transaction or a firearm."  (ECF No. 35, at 3.)  Trenell notes that both the affidavit of complaint and the incident report state that Officer Alvarado saw Trenell loitering, whereas Officer Alvarado admitted at the hearing that he did not, and he could not explain why neither the affidavit nor report mention the hand-to-hand transaction or the firearm.  In addition, though Detective Westrich testified that he radioed the team about the suspected transaction and firearm and gave a description of Trenell and his car, he could not actually recall at the hearing what Trenell was wearing, how or where he saw the firearm, or what kind of car Trenell got into.  He also admitted he did not see what was transferred in the hand-to-hand transaction and he observed the interaction through "cheap" binoculars.

Notwithstanding these gaps and inconsistencies, the Court finds the officers' testimony about the radio transmission credible.  The Court is given "wide latitude" in making witness credibility determinations.  *Haynes*, 301 F.3d at 679  (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75 (1985)).  "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic."  *United States v. Vaughn*, 429 F. Supp. 3d 499, 529 (E.D. Tenn. 2019) (quoting *United States v. Caldwell*, No. 1:13-cr-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015)).

The officers' testimony is largely consistent and is corroborated by the bodycam video. All four officers testified that Detective Westrich utilized the car-to-car radio to alert the team about Trenell. Though most of them could not recite the details of the description of Trenell and his car provided by Detective Westrich, their demeanor in testifying indicated a genuine failure of memory rather than a lack of truthfulness. Indeed, the bodycam video captures Officer Bartlett expressly referencing Detective Westrich's radioed information multiple times, voicing confusion about why the other officers had not come directly to the vehicle that matched his description—e.g., "this is the car he saw him get in with the gun. Literally called it out," and "this is the car they called out, I don't know why nobody else came over here." And when confronted about the statements in his report that he observed Trenell loitering, Officer Alvarado readily admitted that he made a mistake. The officers credibly testified that Detective Westrich saw and communicated that Trenell engaged in a hand-to-hand transaction while armed, and that information, as part of the totality of the circumstances, created reasonable suspicion to stop Trenell.

## II.    The Legality of the Search

Trenell next argues that the search of his vehicle was without probable cause. "[T]he Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). The "automobile exception," premised on the "ready mobility" of an automobile and the "lesser expectation of privacy resulting from its use," permits officers to "conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Id.* (quoting *Pennsylvania v. Labron*, 518

U.S. 938, 940 (1996); *California v. Carney*, 471 U.S. 386, 391 (1985); *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)).

"Probable cause exists when there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Haworth*, No. 22-1050, 2022 WL 7367260 (Oct. 13, 2022) (quoting *Smith*, 510 F.3d at 650). "The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical question' to be judged from the 'totality of the circumstances,'" based on "the objective facts known to the officers at the time of the search." *Smith*, 510 F.3d at 648 (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074–75 (6th Cir. 1998)). "Reasonable suspicion . . . may ripen into probable cause to search a vehicle based on the officer's interactions with the vehicle's occupants." *United States v. Lyons*, 687 F.3d 754, 769–70 (6th Cir. 2012) (citing *United States v. Craig*, 198 F. App'x 459, 463 (6th Cir. 2006)).

Detective Laine had probable cause to believe the SUV contained evidence of a crime, and thus probable cause to search the SUV. Before she began the search, Detective Laine had heard Detective Westrich's report that an individual matching Trenell's description got into the SUV after engaging in a hand-to-hand transaction. Detective Westrich further indicated that the individual was armed. Detective Laine was permitted to rely on this information under the collective knowledge doctrine, which "recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *Lyons*, 687 F.3d at 766 & n.4 (quoting *United States v. Hensley*, 496 U.S. 221, 231 (1985)) (discussing the collective knowledge doctrine in the context of a *Terry* stop but holding that it "applies equally . . . to vehicle searches"). The doctrine "permits an officer to 'conduct a stop based on information obtained from fellow officers.'" *Bey*

*v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) (quoting *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015)). Here, Detective Laine testified that she searched the SUV in reliance on the information she learned from Detective Westrich, information Detective Westrich communicated as he watched Trenell from across the street. That knowledge is thus properly imputed to Detective Laine.

In addition, Detective Laine conducted the search within minutes (likely less than ten) of Detective Westrich reporting that Trenell had gotten into the SUV following the hand-to-hand transaction. She was also aware, before she began the search, that Trenell had been arrested, though she did not know the charge. Furthermore, Officer Alvarado had begun to pat Trenell down approximately fifteen seconds before Detective Laine began to search the SUV, only steps away; his failure to locate a firearm on Trenell in that time increased the likelihood that it was in the SUV.[7] Finally, it is reasonable to infer that Detective Laine, a relatively experienced officer, knew the carwash was a popular location for drug sales. Though she did not specifically testify as much, the other officers did, and Detective Laine stated that she was familiar with the carwash, which was just around the corner from the Airways precinct where she worked. Based on the totality of those circumstances known to Detective Laine at the time, there was a fair probability that evidence of a crime would be found in the SUV.

Trenell offers a number of arguments as to why the search was unlawful. He first argues that Detective Laine did not know that he was a convicted felon at the time of the search. But

---

[7] It is evident that Detective Laine was primarily searching for the firearm. When she first walked up to Officer Bartlett, he pointed to the silver SUV and stated, "alright, this is the car he saw him get in with the gun." Officer Bartlett then immediately told Trenell's girlfriend to unlock the car, and Detective Laine grabbed the key fob and pressed the unlock button. She then began the search, at one point saying, "I don't see one," and then, after finding the firearm, saying, "oh here it is." She then secured the firearm while other officers completed the search of the SUV.

that fact is largely immaterial to the probable cause determination.  Trenell's implication that
such knowledge would help to establish probable cause is correct, as his mere possession of a
firearm (as observed by Detective Westrich), combined with knowledge that he was a felon, is
evidence of a crime—i.e., the possession of a firearm by a convicted felon.  But Detective Laine
had a different crime in mind.  She heard Detective Westrich's broadcast that he saw Trenell
engage in a hand-to-hand transaction and that he was armed, and she testified that she was aware,
before the search, that "it was illegal to deal drugs while carrying a gun."  She therefore knew
that the firearm could constitute evidence of a crime regardless of Trenell's felony status.

Trenell next highlights that Detective Laine unlocked the SUV without permission, but
that detail is also immaterial.  Where officers have probable cause to search a car, such that the
automobile exception applies, they have a lawful right of access to the interior of the car,
whether locked or not.  *See United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011) (citing
cases upholding searches where officers forced entry into the vehicle); *United States v. Plump*,
553 F. Supp. 3d 435, (S.D. Ohio 2021) (applying *Galaviz* and finding officers did not need a
warrant to use the defendant's keys to unlock his car once the automobile exception applied).
Because Detective Laine had probable cause to search the SUV, she was entitled to use the keys
to unlock the vehicle, with or without permission from Trenell or his girlfriend.

Trenell observes that Detective Laine did not see a gun or drugs in the vehicle when she
looked through the window before the search.  The relevance of that fact is limited, however,
because the United States seeks to rely on the automobile exception, not the plain view

14

exception, to the warrant requirement. The lack of contraband in plain view may not have contributed to the existence of probable cause,[8] but it did not detract from it either.

Trenell asserts that he was still being searched by Officer Alvarado when Detective Laine began to search the SUV and that no guns or drugs were found on him. However, Officer Alvarado's search of Trenell began approximately fifteen seconds before Detective Laine's search of the SUV, with the entire pat-down taking approximately twenty seconds. And, as discussed above, the absence of a firearm on his person increased, rather than decreased, the likelihood that a firearm would be found in the SUV, as Detective Westrich had seen Trenell in possession of a firearm immediately before he got into the SUV. Moreover, even if Officer Alvarado had found a firearm on Trenell, probable cause would likely still exist that contraband or evidence of a crime—such as indicia of drug trafficking or another weapon—would be found in the SUV. Under the totality of the circumstances, Detective Laine's failure to wait for the

---

[8] The record is somewhat inconsistent regarding the location of the firearm in the SUV. Detective Laine testified that she did not see the firearm when she looked in the window of the SUV, but Officer Alvarado testified that Detective Laine told him she saw the firearm in plain view. Detective Laine described the firearm's location as "a slot on the side of the radio" and "an open unlocked slot," not the glove compartment. The bodycam video, however, appears to show the firearm as located in the glove compartment, which was unopened when Detective Laine began to search but was opened, presumably by another officer, at some point during her search—though the video does not clearly or consistently capture the glove compartment area throughout Detective Laine's search. She ultimately conceded that the firearm was found in the general area of the glove compartment and that she was not sure where, without the actual vehicle in front of her. In any event, as discussed herein, Detective Laine's inability to see the firearm in plain view does not impact the analysis.

Nor would it matter if the firearm were located in a closed glove compartment, as the application of the automobile exception means that officers were permitted to search the glove compartment and any other container in the vehicle. *See Carter v. Parris*, 910 F.3d 835, 840 (6th Cir. 2018) ("The Supreme Court long ago dispensed with any categorical distinction between cars and the containers within cars. So long as 'probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part* of the vehicle and its contents that may conceal the object of the search.'" (quoting *California v. Acevedo*, 500 U.S. 565, 570–72; *United States v. Ross*, 456 U.S. 798, 823 (1982)).

search of Trenell to conclude before beginning her search of the SUV does not negate probable cause.

Trenell next argues that Detective Laine's "tendency was to try to search vehicles without any knowledge of investigations or evidence," noting that she attempted to enter the vehicle of "another individual who had been removed from his car on the lot of the car wash." (ECF No. 35, at 5.) Indeed, Detective Laine's bodycam video shows that she tried to open Trenell's SUV by pulling on the handle as soon as she walked up to it, though it was locked. However, even if Detective Laine had subjectively intended to search the SUV without the requisite cause, that intention would not invalidate the objective facts establishing probable cause known to her at the time of her search. "[T]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. . . . [T]he issue is not his state of mind, but the objective effect of his actions." *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996); *California v. Ciraolo*, 476 U.S. 207, 212 (1986)). Because the objective facts known to Detective Laine before she began the search are sufficient to constitute probable cause, her subjective intentions cannot create a Fourth Amendment violation.

Finally, Trenell argues that the search was conducted "hastily . . . before all facts were known to all officers" and that "Detective Laine could have waited, investigated, talked to Mr. Trenell and his girlfriend, and either developed probable cause or obtained a warrant for the blocked-in car." (ECF No. 35, at 5–6.) The Fourth Amendment, however, "does not demand 'best practices or formulaic adherence to one search method over another.'" *United States v. Eastman*, 645 F. App'x 476, 479 (6th Cir. 2016) (quoting *United States v. Walker*, 615 F.3d 728, 732 (6th Cir. 2010)) ("Would having sought a warrant here been better police practice?

16

Perhaps.").  That Detective Laine could have taken additional steps to secure more cause to search the SUV does not undermine the probable cause she already objectively possessed.  *See, e.g.*, *United States v. Hill*, No. 3:21-cr-040, 2022 WL 709191, at *5 (E.D. Tenn. Mar. 9, 2022) (citing *Lyons*, 687 F.3d at 766) ("The instant traffic stop was fast-moving.  It involved multiple officers, multiple suspects, and multiple issues.  In such circumstances, officers must act swiftly and cannot be expected to cross-examine their fellow officers on every point.").

The Court finds that Detective Laine had probable cause to believe the SUV would contain evidence of a crime or contraband, based on the objective facts she knew at the time, including the information communicated to her by Detective Westrich.  As such, her warrantless search of the SUV was constitutional pursuant to the automobile exception, and the Court recommends Trenell's motion be denied.

## III.    The United States' Alternative Arguments

Should the District Court decline to adopt the recommendation above, the Court addresses the United States' remaining arguments.  First, the United States argues that Officer Bartlett knew Trenell was a convicted felon and communicated that information to Detective Laine, who relied on it in executing the search of the SUV.  The Court finds that Officer Bartlett knew Trenell was a convicted felon—he had read Officer Alvarado's PDA showing Trenell's outstanding warrants, and he knew that one of those warrants was for being a felon in possession of a firearm.  He thus knew that, if a firearm was found in the SUV, it could be evidence of a crime—i.e., a felon-in-possession charge.

Officer Bartlett also knew that there was a fair probability that the firearm was in the SUV.  He was right beside Trenell from the moment he got out of the SUV until Officer Alvarado took him away for a pat-down.  In that time, Officer Bartlett observed Trenell as he got

out of the SUV, took his wallet out of his pocket, waited for Officer Alvarado to run him through the database, was handcuffed, and had his girlfriend reach several times into his pants pockets to retrieve other items. As seen in Officer Alvarado's bodycam video, the waistband of Trenell's jeans is largely visible below the hem of his white T-shirt. Those objective facts, known to Officer Bartlett at the time, indicate a strong likelihood that Trenell did not have a firearm in his waistband, or anywhere else on his body, at that time. Officer Bartlett therefore had probable cause to believe that the firearm Detective Westrich had seen was in the SUV.

The United States has not, however, satisfied its burden of demonstrating that Detective Laine relied on information from Officer Bartlett in her search of the SUV. When an officer acts on another officer's direction without knowledge of the underlying facts, the collective knowledge doctrine applies if the following criteria are satisfied: "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Lyons*, 687 F.3d at 767. The United States argues that Officer Bartlett "indirectly" communicated to Detective Laine that "they needed to search this car." (ECF No. 36, at 4.) That indirect communication, presumably, was Officer Bartlett pointing to the SUV and saying, "this is the car he saw him get in with the gun," and then immediately asking Trenell's girlfriend to unlock the car. Even assuming those actions constitute a communication to Detective Laine to search the SUV, however, the United States has not demonstrated reliance. As discussed above, Detective Laine had already tried to open the locked door of the SUV before this communication, as she had tried to do on other cars parked at the carwash, and it is reasonable to infer that Detective Laine intended to search the SUV at that point.

As such, the United States has not demonstrated that she relied on any information from Officer Bartlett. Unlike in the determination of whether she possessed knowledge of objective facts supporting probable cause, in which her subjective intention is irrelevant, here the United States was required to show that she actually relied on the imputed knowledge from another officer.[9] Nothing in the record indicates that she did. She did not testify that she searched the SUV in reliance on anything communicated by Officer Bartlett,[10] and reliance cannot be inferred

---

[9] *Lyons* adopted the term "objective reliance" from the test formulated by the Seventh Circuit. *Lyons*, 687 F.3d at 767 (citing *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010)). The Seventh Circuit test was crafted based on the Supreme Court's opinion in *United States v. Hensley*. *See United States v. Wheeler*, 800 F.2d 100, 103 (7th Cir. 1986), *overruled on other grounds by United States v. Sblendorio*, 830 F.2d 1382 (7th Cir. 1987), (citing *United States v. Hensley*, 469 U.S. 221 (1985)). As stated in *Hensley*, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a" *Terry* stop. 469 U.S. at 232. "If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. . . . It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it." *Id.* (citing *Terry*, 392 U.S. at 21–22). Thus, it appears that the term "objective reliance" means "reliance that is objectively reasonable." *See Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 822 (6th Cir. 1999) (Clay, J., dissenting) ("While the Supreme Court has not specified the meaning of the term 'objective reliance,' courts have interpreted the requirement to mean that an officer's reliance on a radio bulletin in making an investigative stop 'must be objectively reasonable: did the facts available to the officer at the time of the *Terry* stop warrant a reasonable belief that the action was appropriate?'" (quoting *United States v. Longmire*, 761 F.2d 411, 416 (7th Cir. 1985)); *see also Bey*, 946 F.3d at 318 (discussing the collective knowledge doctrine in the context of a § 1983 case and describing the executing officer's "reasonable reliance" on the information the investigating officer gave him).

Nothing about the requirement that reliance be objectively reasonable, however, vitiates the need to demonstrate actual reliance. Here, it appears any reliance by Detective Laine on information communicated by Officer Bartlett would have been objectively reasonable—he knew everything she knew about Trenell, plus he had been engaged with Trenell since he arrived at the carwash and was involved in his arrest. So, if Officer Bartlett did communicate to Detective Laine to search the SUV, and if she had, in fact, relied on that communication, then that reliance would have been reasonable. But the United States failed to prove that she actually relied on Officer Bartlett's knowledge.

[10] In response to questioning about whether she knew Trenell had outstanding warrants, Detective Laine testified that "[w]hen we arrest people we have certain things that we do in order to let other officers know what's going on without saying things out loud," such as body language or hand gestures. "I knew at the time when Beard called me over—that officer that

---

from the evidence because she was willing to initiate a search of the SUV before receiving that communication. *See Lyons*, 687 F.3d at 768 (approving of application of the collective knowledge doctrine because "[t]he record demonstrates that the troopers were not acting on their own initiative when they stopped Defendant. The troopers testified that they had no independent basis to target the minivan; rather, they did so based solely on Agent Graber's request."). Officer Bartlett's additional knowledge of Trenell's felony status therefore cannot be imputed to Detective Laine, and her search must be judged on the objective facts known only to her (including those communicated to her by Detective Westrich).

Second, the United States argues that the warrantless search of the SUV was proper because it was pursuant to an administrative policy. (ECF No. 36, at 5.) Here, again, the record is insufficiently developed to sustain this argument, with the following exchange from the examination of Detective Laine providing the sole piece of supporting evidence:

Q.      Does your policy allow for you to search that vehicle?

A.      Yes, sir.

The United States is correct that officer testimony may be sufficient to support the existence of a policy, citing *United States v. Tackett*, but that case also requires that the "testimony establish[] the existence and contours of the policy." 486 F.3d 230, 233 (6th Cir. 2007) (accepting officer testimony to support the existence of an inventory policy where "officers testified at length" about the policy). No such contours were provided in the testimony in this case; indeed, the

---

tells me to come over—that the individual was under arrest at that time." Detective Laine therefore discussed how she learned through indirect communication from Beard (another officer involved in the operation) that Trenell had been arrested. She says nothing, however, about learning from Officer Bartlett that the SUV needed to be searched or that Trenell was a convicted felon.

policy is neither named nor described.[11]  The inventory exception to the warrant requirement

thus cannot save the search in this case.

## **<u>RECOMMENDATION</u>**

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 22nd day of November, 2022.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation, a
party may serve and file written objections to the proposed findings and recommendations.
Fed. R. Crim. P. 59(b)(2).  A party may respond to another party's objections within fourteen
(14) days after being served with a copy.  Failure to file objections within fourteen (14) days
may constitute waiver of objections, exceptions, and further appeal.

---

[11] Detective Laine elsewhere in her testimony referred to a policy that "says you have to search
[an arrestee] before they enter your squad car," which appears unrelated to the type of inventory
search policy suggested by the United States.